GREEN BARRETT, Respondent, v. FREDERIC A. DELANO, et. al. as Receivers of the WABASH RAILROAD COMPANY, Appellants.

Kansas City Court of Appeals, February 1, 1915.

1. NEGLIGENCE: Railroads: Warning: Collision. The plaintiff was injured at a public crossing on defendant's railroad and sued to recover damages therefor. The defendant's train without warning of its approach struck the wagon in which plaintiff was riding, and he was thrown out and injured. Held, that defendant was negligent in failing to perform its statutory duty to sound the whistle or ring the bell, and if plaintiff was in position to have heard the whistle or bell, he was not required in law to exercise extraordinary precaution of stopping.

2. ———: Crossings: Signal of Danger. A railroad crossing is within itself a signal of danger. The law imposes upon the traveler the duty of exercising caution at such places. He must make some effort to find out if there is an approaching train before he drives upon the track. He can close neither his eyes nor his ears. The means of self protection must be used. A failure to do so constitutes negligence.

3. **INSTRUCTIONS: Contributory Negligence: Criticism.** Where an instruction, if it stood alone, would be subject to criticism on the subject of contributory negligence, yet, where it is read with other instructions given at request of plaintiff, and such instructions are so read as a single charge, it is incumbent upon the appellate court to assume that the jury read them carefully, with intelligence, and construed them reasonably.

Appeal from Boone Circuit Court.—*Hon. D. H. Harris,* Judge.

AFFIRMED.

*James L. Minnis* and *McBaine & Clark* for appellants.

*J. L. Stephens* and *H. A. Collier* for respondent.

JOHNSON, J.—Plaintiff was injured at a public crossing on defendant's railroad and sued to recover his damages on the grounds that the injury which he received in a collision between his wagon and a train was caused by negligence in the operation of the train and by failure of the engineer to give the statutory signal for the crossing. The only specified negligence in the operation of the train was that of running the locomotive with the tender in front. The answer is a general denial and a plea of contributory negligence. The cause is before us on the appeal of defendant from a judgment for $3500, recovered by plaintiff in the circuit court.

The principal question for our solution is the right of plaintiff to recover under the evidence most favorable to him. The injury occurred at eight o'clock in the morning of September 15, 1913, at the Keene crossing on defendant's branch line between Centralia and Columbia. At this place the course of the railroad is a straight line from northeast to the southwest. A public highway known as the Paris road runs parallel with the railroad, immediately east of the right of way,

and at a point a mile and a half northeast of Columbia another road running due north diverges and crosses the railroad at an acute angle. Plaintiff, an old negro, left Columbia that morning in a light wagon drawn by a horse and a mule to go to a farm where he was employed as a laborer. He drove out on the Paris road to the junction with the north and south road and thence on the latter road to, and on, the crossing where the rear end of his wagon was struck by a southbound mixed train. The locomotive drawing the train was running backward and the wagon was struck by the tender.

The proof is conclusive that the bell was not rung during the approach of the train and there is ample evidence in support of the allegation that the whistle was not sounded for that crossing. There is some evidence that it was sounded for the next public crossing north, but it is conceded by counsel for defendant, as it must be, that plaintiff's evidence discloses a cause of action based on the failure of the engineer to give the statutory signals for the crossing unless it should further appear from the evidence and the reasonable inferences therefrom that negligence of plaintiff indisputably contributed to his injury.

The material facts bearing on that issue thus may be stated: Going northeast from the crossing the railroad, which consisted of a single track, ran straight through a cut and on a slight up grade which continued a distance of about 500 feet; thence a distance of 100 feet or more the track was practically level, and thence on a slight decline. The whistling post was a quarter of a mile from the crossing and was near a slight curve of the track towards a more easterly course. The width of the cut at the top of its banks was about forty feet and at the bottom about fifteen feet. There is a controversy over the depth of the cut, but for the purposes of the demurrer to the evidence, we accept the statement of witnesses for plain-

tiff who say it was ten or twelve feet at the deepest places. In approaching the crossing from the south, especially after passing from the Paris road to the road crossing the track, the view of the train which plaintiff had while seated in his wagon was completely shut off by the east embankment and perhaps the most important fact in the whole case is the distance plaintiff was from the track when he passed from behind that obstruction and was afforded an unobstructed view of the approaching train. His own testimony relating to this fact is indefinite, owing, no doubt, to his ignorance, lack of observation, and inaccurate memory. The following quotation from his testimony will give a fair idea of the old negro's guilelessness and of the hopelessness of extracting from his testimony definite information about distances and opportunities for protective observations, but it does give a graphic picture of his solicitude for his own safety.

"I was looking all the way until I got clear up to the crossing. I always look. . . . I looked down this way and then I looked back up yonder that way and when I turned my head I don't know where I was looking—I was looking down the railroad and it was right on me. I looked towards Centralia and I looked down this way, too. That is a habit I have.

"Q. About how far were you from the crossing when you first looked? A. I was a right smart little piece down the road I suppose, but not very far.

"Q. Well, how far from the crossing was the bend in the road where you turn to go up to the crossing; how far would that bend be from the crossing when you make the bend? A. It ain't very far, something like across this space, I reckon (indicating space).

"Q. Well, fifty or sixty feet? A. I don't know sir, it ain't no use for me to say exactly for I don't know. I have driven it lots of times, too.

"Q. As you made the bend in the road to go upon the crossing what did you do at that time with refer-

ence to looking? A. Of course I looked down the road towards Centralia and down towards Columbia and when I turned my head around back it was right onto me; there ain't no use talking—and bumping me, too.

"Q. What was onto you? A. The train was right on me."

On cross-examination: "Q. But you weren't looking for a train from Centralia? A. Yes, sir, I was looking for it and I knowed it had not come down.

"Q. But you weren't expecting it yet? A. I could not say—I was looking both ways.

"Q. Which way were you looking most for the train to come? A. I always look this way and that way (indicating)—I always keep myself in motion.

"Q. When you looked down towards Centralia and then to Columbia, and then back, the train was right on you? A. Yes, sir, it looked like it come right out of the ground. I said to myself, 'I'm gone. Lord have mercy.' "

"Q. It came upon you so suddenly it looked like it came out of the ground? A. Yes, sir.

"Q. When did you first begin looking that morning for the train? A. I went to looking before I went to go across.

"Q. How far from the crossing? A. O, a good piece. It always scares my horses.

"Q. Weren't your horses across the track when you were hit? A. I expect they were.

"Q. Your horses weren't hit by the train? A. I cannot tell you.

"Q. Your wagon was near the center of the track? A. I cannot say.

"Q. You were sitting in a seat in the wagon? A. Yes, sir, I had an old spring seat.

"Q. How high was that spring seat from the ground—about the height of your shoulders? A. Yes, sir, I expect it was. My bed was a shallow bed."

In coming out from Columbia plaintiff noticed a northbound train standing at an ice house and while approaching the crossing was expecting that train to pass,. but his testimony shows that he did not confine his attentions to that quarter, but was alert and looked first to the right and then to the left for a train from either direction. His team trotted slowly until they neared the crossing when they changed to a walk and proceeded over the crossing at a slow pace. At the moment of the collision the front wheels of the wagon had crossed the west rail and the hind wheels were at the east rail.

Plaintiff's portrayal of his conduct discloses that he was vigilant, but defendant argues that it must be rejected as wholly lacking in probative strength because of its manifest inconsistency with the plain and indisputable physical features of the situation which show that if he had looked while he was in a place of safety, he could have seen the train, which was in plain sight. The speed of the train is not stated in the evidence, but from the descriptions of the witnesses, the inference is fairly deducible that it was five or six times that of the team. When plaintiff was twenty-two feet from the track the heads of his team were at least eight feet from the path of danger, and the train was from 175 to 200 feet from the crossing; when he was thirty-three feet from the track, the train approximately was 225 feet away, and when he was fifty feet it was 300 feet or more. Photographs taken under the direction of defendant at these respective distances from the track in the line of plaintiff's approach indicate that the train must have been in plain and wholly unobstructed view when plaintiff was thirty-three feet from the crossing, and in partial view when he was fifty feet away. But there is substantial evidence tending to contradict, not the disclosures of the photographs themselves, but the testimony of witnesses for defendant relating to the positions from which they were taken.

For example one of plaintiff's witnesses stated that sometime after the injury he drove in a surrey to the crossing at a time when a train was coming from the north and closely noted the point at which the train could be seen, though he took no measurements. He said that ten feet from the track the locomotive could be seen back to the whistling post but at twenty feet the embankment cut off the view and remarked about the point twenty-five feet from the track that it was "about the most obscure place you could stand." The testimony of this witness corroborates that of plaintiff and tends to show that he could not have seen the train until the heads of his team had entered or were just on the point of entering the zone of danger.

The burden of pleading and proving contributory negligence as a factor in the production of an injury is wisely laid upon a defendant whose negligence appears to have been an important and concurring factor and it is only in cases where the evidence most favorable to the plaintiff, with its legitimate inferences, shows unquestionably that he was guilty of contributory negligence that the court is warranted in holding such negligence established in law and, therefore, that the plaintiff has no case to submit to the triers of fact.

Tested by this rule, we think the evidence before us presents the question of contributory negligence as an issue of fact for the jury to determine. The physical features of the situation of plaintiff during his progress towards the crossing, as described in his evidence which is substantial, appear to have deprived him of reasonable opportunity to learn of the coming of the train through the medium of his senses of sight and hearing. The train was running down grade, with minimum noise, behind the barrier of the embankment which screened it from plaintiff's view and obstructed the transmission of its sounds. There is room for the inference that the greatest concentration of his faculties, in furtherance of his purpose of ascertaining

whether or not a train was coming from that direction, would not have revealed its presence until he emerged from behind the obstructing embankment.

The duty of plaintiff was to make reasonable use of his senses for his own protection and if it appeared from his evidence that he was heedless or inattentive, he would not be allowed to excuse himself on the ground that he relied upon the presumption that the engineer of a train approaching the crossing would not fail in his duty to give the crossing signal required by law. The pertinent rule, repeated again and again in the decisions, is that "a railroad crossing is within itself a signal of danger. The law imposes upon the traveler the duty of exercising caution at such places. He must make some effort to find out if there is an approaching train before he drives upon the track. He can close neither his eyes nor his ears. The mean of self-protection must be used. A failure to do so constitutes negligence." [Burge v. Railroad, 244 Mo. l. c. 94; Dyrcz v. Railroad, 238 Mo. 33; Osborne v. Railway, 179 Mo. App. 245.]

The question in such cases is whether or not the conduct under analysis was of a character one would expect from an ordinarily careful and prudent man in the situation of the traveler. Warned by the crossing itself that danger might be lurking there, an ordinarily prudent man would not place implicit trust in the presumption that another would perform a duty imposed upon him which, if performed, would give notice of imminent danger, but would obey the dictates of the instinct for life and safety by making full use of his natural means for protection.

But how may it be said apodictically that plaintiff's conduct was out of harmony with the dictates of reasonable prudence or with what is the same thing, the normal impulses of the instinct of self-preservation? He approached the crossing at cautious speed, looking alternately to right and left and attentively

listening. He had more reason to expect a train from the south than from the north and when he passed from behind the obstructing screen was looking momentarily in that direction. It was his duty to look in that direction as well as in the other, and he should not be pronounced negligent in law for looking there first. When he turned his eyes northward he had reached the zone of danger and was where he could not extricate himself. The only thing he could have done for his protection that he did not do would have been to stop at the point from which he could have the first view up and down the track until he could ascertain whether or not a train was coming from either direction. The triers of fact, being invested with the function of solving debatable issues pertaining to the characterization of human conduct, well might have inferred that ordinary prudence would have impelled a person in the situation of plaintiff to take such precaution but we cannot say, as a matter of law, that his failure so to act was indisputably negligent, i. e. was inconsistent with normal human conduct. Where the facts bearing on the issue of contributory negligence admit of different constructions and inferences and solutions of the issue, the court could not adopt and give effect to one of two such opposite conclusions without invading the province of the jury. [Eckhard v. Transit Co., 190 Mo. 593.] Paraphrasing what was said by the St. Louis Court of Appeals in Elliott v. Railroad, 105 Mo. App. 1. c. 533, circumstances might arise where ordinary prudence would require such a precaution to be taken by one before attempting to cross a railroad track on a public highway, but we do not think the evidence in this case conclusively shows that plaintiff should have taken this extraordinary precaution in the circumstances that surrounded him at the time. He had a right to place some reliance upon defendant's performance of its statutory duty to sound the whistle, or ring the bell (Donohue v. Railway, 91 Mo. 357; Weller v. Railway, 120 Mo. 635)

and if he was in a position to have heard the whistle or bell, he was not required in law to exercise the extraordinary precaution of stopping. [Elliott v. Railroad, supra, l. c. 532.]

The demurrer to the evidence was properly overruled.

We do not agree with counsel for defendant that plaintiff's instruction "D" broadened the issues of negligence raised by the pleadings. Standing alone instruction "B" on the subject of contributory negligence might be subject to the criticism of authorizing a verdict for plaintiff on the sole finding that he had not been guilty of contributory negligence but read with the other instructions given at the request of plaintiff, such construction would be most strained and unreasonable. The instructions should be read as a single charge and we must assume that the jury read them carefully, with intelligence, and construed them reasonably.

The point of an excessive verdict is so obviously ill founded that it need not be discussed. There is no prejudicial error in the record and the judgment is affirmed. All concur.